**James Edward MARTIN, Appellee,**

**v.**

**COMMONWEALTH OF VIRGINIA and C. C. Peyton, Superintendent of the Virginia State Penitentiary, Appellants.**

**No. 10470.**

United States Court of Appeals Fourth Circuit.

Argued May 2, 1966.

Decided July 26, 1966.

Reno S. Harp, III, Asst. Atty. Gen. of Virginia (Robert Y. Button, Atty. Gen. of Virginia, on brief), for appellants.

Ivy P. Blue, Jr., Richmond, Va., Court-assigned counsel (Blue, Gordon, Saunders & Neblett, Richmond, Va., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and SOBELOFF and BOREMAN, Circuit Judges.

SOBELOFF, Circuit Judge:

The Commonwealth of Virginia here appeals from the District Court's order vacating a state court's judgment of conviction and directing a new trial. For reasons to be stated we affirm.

On August 9, 1960, James Edward Martin and two other Negro prisoners escaped from a road gang in Montgomery County, Virginia. Sometime the next evening they came upon the house of Mr. Joseph E. "Ted" Willard, whose automobile was parked in his driveway. As they were pushing the car down the drive into the highway and trying to get it started, the three escapees were chased away by Mr. Willard. Soon afterward they were recaptured and returned to the road camp. While they were at large, the radio broadcast news bulletins every few minutes, and feeling ran high in the community.

On October 3, 1960, Martin and his two fellow prisoners were indicted, tried and convicted for escape and grand larceny.[1] The indictments were handed up by the grand jury between eleven and eleven thirty that morning, and the trial judge appointed an experienced member of the local bar to represent Martin. After discussing the case with Sergeant Reynolds, the officer in charge of the road camp, the attorney spoke briefly with Martin. It is noteworthy that Sergeant Reynolds was present during this conference, at which Martin simply stated that he wanted to plead guilty and "get it over with."

Court was recessed for lunch at twelve o'clock. The appointed counsel sought to

---

[1]. In the two months between capture and indictment they had no legal assistance. Martin's petition alleged that he was denied the use of the mails and access to anyone outside the place of his confinement. These allegations the District Judge did not pass upon, as he found other grounds warranting relief.

negotiate a guilty plea to some lesser charge, but he found the Commonwealth's Attorney "rather bitter because of the situation which created quite a disturbance in our community." At this stage in his representation, the court-appointed attorney had spent less than 30 minutes investigating the case. No change of venue was sought.

After lunch, the attorney talked with several others and conferred again with Martin. Sergeant Reynolds was present at this conference also, and Martin simply repeated his desire to plead guilty. Because of his inability to strike a bargain with the Commonwealth's Attorney, and because in his view—based on his brief acquaintance with the case—there were no possible defenses, the attorney concluded that such a plea would be advisable.

The court reconvened at two o'clock, and Martin and his codefendants were called for trial about three, less than four hours after the indictment. Martin's attorney entered a guilty plea, and several witnesses for the State testified without cross-examination as to the general background of the offenses. Martin was found guilty, and the attorney made a short statement asking for leniency. Although no aggravating circumstances appeared, the court imposed consecutive sentences of five years for the escape (the maximum) and three years for the alleged grand larceny (of a five year maximum). No appeal was taken from these judgments.

In 1965, Martin petitioned the District Court for the Eastern District of Virginia, to void these convictions. Following a hearing ordered by this court,[2] the District Court vacated the sentences on the ground that trial on the very day counsel was appointed afforded him insufficient time to investigate the case and reflect on possible defenses to the charges. Judge Butzner articulated his reasoning as follows:

"The Court recognizes that in each of these cases [dealing with effectiveness of court-appointed counsel's representation] the facts were different, but the principles are not different. The appellate courts have insisted that ample time be allowed counsel for preparation. They pointed to possible prejudice in some of the cases, but a showing of actual prejudice is not the basis on which these cases rest. The lack of opportunity for investigation, reflection, conference, and mature consideration which results from trials of felonies immediately after appointment of counsel provides the basis for granting the writ. * * * Courts need not look for specific prejudice. The burden isn't on the petitioner to show that he would profit by a trial in which counsel had more time for preparation. Lack of due process is implicit when a felon is tried immediately after the appointment of counsel. * * * To hold otherwise simply invites courts to continue the procedure that leads to *pro forma* representation. The State can show no compelling reason for indicting a felon, appointing counsel, and trying him all on the same day."[3]

■■■ This condemnation of the one-day indictment, designation of counsel,

---

**2.** See Martin v. Commonwealth of Virginia, 349 F.2d 781 (4th Cir. 1965), where this court treated Martin's original request for declaratory relief as a petition for habeas corpus, and held that habeas corpus was available to challenge a sentence not to be served until the future, but which affects a prisoner's eligibility for parole.

**3.** Since Judge Butzner's decision, the Supreme Court has used the same approach in a similar context. In Estes v. State of Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), the Court said that:

"It is true that in most cases involving claims of due process deprivations we require a showing of identifiable prejudice to the accused. Nevertheless, at times a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process." Id. at 542–543, 85 S.Ct. at 1632–1633.

and trial is in the spirit of earlier decisions in this circuit. See, e. g., Turner v. State of Maryland, 318 F.2d 852 (4th Cir. 1963); Edgerton v. State of North Carolina, 315 F.2d 676 (4th Cir. 1963); Jones v. Cunningham, 313 F.2d 347 (4th Cir. 1963). The opinions in these cases recognize that "[t]he act of appointing counsel is not enough if in the circumstances the traverser is not afforded in any substantial sense professional advice and guidance, and this includes an opportunity to prepare for trial." Edgerton v. State of North Carolina, supra 315 F.2d at 678. Thus, when the initial consultation between a court-appointed attorney and his client occurs only a short time before the trial, "[n]ormally, in the absence of clear proof that no prejudice resulted, we should be obliged to treat the lawyer's representation as inadequate and the trial as falling short of the standards of due process guaranteed by the Fourteenth Amendment." Turner v. State of Maryland, supra 318 F.2d at 854. These and other cases, while differing in their particular facts, establish the principle that a lawyer's duty in representing a person charged with crime may not be discharged perfunctorily or mechanically. Representation is not adequate and a trial does not meet the standard of fundamental fairness if a court-appointed attorney is not afforded an adequate opportunity to investigate and reflect upon his client's case.[4]

In Turner v. State of Maryland, supra, the District Court made detailed findings of fact demonstrating that the inadequate representation had in no way prejudiced the defendant, and on that basis we affirmed dismissal of the petition. The courts have had cumulating experience with the elusive problem of proof in establishing prejudice—or the lack of it—in particular circumstances. On the basis of his experience as a judge in both state and federal courts, Judge Butzner concluded that the inherent danger of prejudice to the client where the attorney allows himself, or is restricted to, such a short time to ready himself for a criminal trial makes additional inquiry futile and unnecessary. He reasoned that when the entire process of indictment, appointment of counsel, and trial is compressed into the span of a few hours, there is grave danger of impairment to the right of adequate representation.

■ Our analysis of the record persuades us that the District Court did not misapply this reasoning in evaluating the instant case. We find a number of nonfrivolous questions that merited thoughtful consideration by counsel. For example, under Virginia law, should the attempted theft of the automobile—for which Martin was sentenced to three years on a grand larceny conviction—more appropriately have been prosecuted as a misdemeanor carrying a sentence that may not exceed twelve months as opposed to a five year maximum penalty for grand larceny?[5] Also, the strong

---

4. See Braxton v. Peyton, 365 F.2d 563 (4th Cir. decided this day). Some indication of the range of questions a court-appointed lawyer must consider in the preparation of a case is provided by a checklist prepared for the use of counsel appointed to represent indigent defendants in federal criminal trials in the District Court of Maryland. See report on the Criminal Justice Act of the Judicial Conference of the United States, 36 F.R.D. 277, 338–341 (1965). In addition to conferences with the accused, the arresting officers, and witnesses, this form suggests some 32 different possible defenses and tactical motions that should be considered. While many of these may

not apply in a given case, they emphasize the variety of factors that must be evaluated, and make plain the danger of overlooking a significant feature when the attorney has only a few hours to prepare.

5. Testifying at the hearing in the District Court, the court-appointed trial attorney described his understanding of the events that gave rise to the grand larceny charge:

"Mr. Willard [the owner of the car] * * * has a big light out in front of his house that he turns on, just floods the whole area there, and he was in his house he told me in my investigation, he heard somebody tinkering with his automobile, or something, and he

community feeling over the case, which inhibited the Commonwealth's Attorney from even discussing the offer of a plea to a lesser charge, and which may have influenced the imposition of what appear to be quite harsh sentences, might well have suggested to the lawyer the advisability of seeking transfer of the prosecution to a different county, or a continuance.[6] Further, if the attorney had not been under the pressure of time he probably would not have thought it prudent to conduct his conferences with the client in the presence of the police sergeant. This was hardly the atmosphere to generate that confidence which should exist between attorney and client, or to invite the kind of free communication between them which is essential. In sum, if the attorney had had a less restricted opportunity to study the facts and the applicable law before going to trial, or before his meeting with the Commonwealth's Attorney, one cannot say that he might not have rendered substantial assistance to Martin.

Whether any attorney would actually have advised petitioner differently because of these factors, or others not disclosed in the record, is not the question.

---

came out on the porch and saw the car backing out into the highway; that he saw three Negroes in prison garb pushing or guiding his car down the road in front of him; that he yelled at them and that they ran. He ran out and his car was still moving slowly and he was able to jump in the car and put on the brake or some way stopped it. * * *" Virginia Code § 18.1–167 (1960), enacted in 1950, made it a *"misdemeanor"* to "climb * * * upon [a] vehicle * * * with the intent to commit any crime," or, while a vehicle "is at rest and unattended, [to] attempt to manipulate any of the levers * * * or to set such vehicle * * * in motion, with the intent to commit any crime." (Emphasis added.) Under § 18.1–9 of the Virginia Code, a misdemeanor is punishable by a fine or "confinement in jail not exceeding twelve months." Faced with a charge of grand larceny, a lawyer not unduly pressed for time might well have seen fit to interpose a defense, relying on the milder statutory penalty for a misdemeanor.

Indeed, it is clear that the "grand larceny" charged here was the most technical of offenses. The District Court found as a fact that Mr. Willard's car had not even left the premises, and certainly there was no "taking" of the vehicle in the ordinary understanding of that term. Slater v. Commonwealth, 179 Va. 264, 18 S.E.2d 909 (1942), affords an interesting contrast. Defendants in that case "attempted or started to take an automobile, * * * but some one appeared on the front porch of the residence in front of which the car was parked and frightened them away." They then took another car and drove it to West Virginia. Although charged and convicted of grand larceny of the second car, it appears from the report of the case that there was no attempt to charge as a felony the unsuccessful attempt to steal the first car. A reasonable inference is that the 1950 statute was designed to cover an aborted attempt to steal an automobile but to make the offense subject to the lesser penalty attaching to a misdemeanor. This suggests that under different circumstances, permitting more opportunity for mature reflection and legal research, the attorney might have induced the prosecutor to drop the grand larceny count or persuaded the court to limit the sentence to one year.

6. That the court-appointed attorney was aware of the community feeling is apparent in the transcript of the District Court hearing:

"Q. Now, as I understand your testimony, you said that you had heard about these three boys who had escaped prior to the day that the trial was held, is that right, sir?

A. Yes.

Q. Been on the radio?

A. I had heard it, but I am not much of a radio fan, but I had heard about it and it was on the radio. People were talking about it.

Q. And the community was quite incensed or worried about it, is that it, is that right?

A. It was.

Q. And because of this set of circumstances, even the Commonwealth's Attorney was not even, would you say, receptive in any sort of compromise, is that what you are saying?

A. He was not much to compromise anything; he was a very volatile gentleman and nervous and you couldn't compromise very much with him on any of these matters."

The question is not one that can now be answered with any degree of certainty, nor need it be answered.[7] The point is that because of the haste that marked the entire process this lawyer was simply in no position to evaluate his case and make considered judgments on these matters.

■■ We find it unnecessary to lay down a rule explicitly invalidating all state convictions where there is an interval of less than a day between indictment and trial. It is for the District Judge—sitting as the trier of fact—to determine whether the danger of prejudice is so great as to warrant a new trial. The lesson to be learned, however, is that the shorter the time for thoughtful preparation, the greater the risk that some valid defense, some unexplored feature of the case not instantly discernible will escape the lawyer. In some instances the court may find that the danger of prejudice arising from the lack of opportunity for preparation is minimal, cf. Turner v. State of Maryland, supra. In others even an interval much longer than one day may afford insufficient time for adequate investigation and reflection. Cf. Edgerton v. State of North Carolina, supra. In this case the District Court found that the likelihood of prejudice arising from an interval of only three and one-half hours from indictment to trial was so substantial that in the interest of fairness a new trial was required.

We were informed at the oral argument that pursuant to a recommendation of the Attorney General against indicting and trying on the same day, the practice is being abandoned in the courts of Virginia. This recognition of the dangers lurking in hasty trials reinforces the appropriateness of the District Court's order under review.

Affirmed.

---

7. Nearly twenty-five years ago, the Supreme Court declared that "[t]he right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." Glasser v. United States, 315 U.S. 60, 76, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942).